THE FRANCISCO R. v. THE WATERLOO and THE GLENALVON.

THE NORWOOD v. SAME.    SAME v. GIRARD POINT STORAGE CO.

(District Court, E. D. Pennsylvania.    February 19, 1897.)

Nos. 14, 49, and 50.

1. COLLISION—VESSELS BREAKING FROM WHARF IN STORM.

Two large vessels were moored side by side to a wharf in the Schuylkill river, off Point Breeze. Heavy rains had fallen, and the water was rising, when, during a storm, one of the posts of the wharf pulled out. A careful examination of the remaining posts was made, but nothing was found to create a doubt of their sufficiency. The water continued to rise, increasing the vertical strain, accompanied by high winds, and on the next day another post pulled out. The vessels could not then be moved without peril to themselves and to others, but new lines were taken to the only other available post. The flood and wind still increased, and, on the following morning, the remaining posts pulled out in succession, the vessels swung out from the wharf, and their sterns struck and injured two vessels on the opposite side of the river. *Held*, that the vessels doing the injury were not liable, as they had taken all the precautions practicable; that they were not blamable for mooring side by side, as was customary; and that it did not appear that it would have been either practicable or serviceable to carry an anchor ashore, and imbed it in the earth, after the first posts gave way.

2. WHARVES—INSUFFICIENT POSTS — VESSELS BREAKING AWAY — DAMAGE TO OTHER VESSELS.

The posts of a wharf on the Schuylkill river, to which two large vessels were moored, pulled out under the vertical strain caused by the rapid rise of the water due to heavy rains, accompanied by high winds, so that the vessels swung across the river, and damaged other moored vessels. *Held*, that the wharfinger was liable for the damage, it appearing that the wharf was old, and had been insufficiently repaired, and that the posts were so short as to extend only about five or six feet below the upper surface of the wharf, instead of being driven deep into the earth.

John Q. Lane, for the Francisco R.

John F. Lewis and Horace L. Cheyney, for the Norwood.

J. Rodman Paul, for the Waterloo.

Francis C. Adler and Theo. M. Etting, for the Glenalvon.

J. Hampton Barnes, for Girard Point Storage Co.

BUTLER, District Judge.    On Monday, May 21, 1894, the Francisco was lying at the Ballast wharf, on the western side of the Schuylkill, off Point Breeze.    A short distance below at this wharf,

the Norwood was lying.    At the same time, the Waterloo and Glen-alvon were moored at the storage company's wharf, on the eastern side of the river, opposite the Francisco, the Glenalvon lying next the wharf and the Waterloo by her side.    The latter vessels are very large and heavy, and ·were attached to the wharf in the usual manner, with lines fastened to eight of its posts.    For several days prior to the 21st rain had fallen almost constantly, and the water was high and rising.    The preceding Saturday was clear until the afternoon, when a thunderstorm of short duration occurred, accompanied by a severe blow from the east.    The consequent strain upon the posts at this time drew one of them out.    A careful examination of the remaining posts and attachments was then made and nothing was discovered to create doubt of their sufficiency.    On the following night rain commenced again and continued pretty steadily throughout Sunday, accompanied by high wind.    In the afternoon of Sunday another of the posts pulled out, when additional lines were taken to the only other available post on the wharf.    The character of the weather and condition of the river were such that the vessels could not be moved without peril to others as well as themselves, after the storm of Sunday night.    On Monday morning the flood was very great and the wind high.    Early in that day other posts pulled out, one after another in pretty rapid succession, until all were gone; and the vessels swung out from the wharf with their sterns across the river, striking and damaging both the Francisco and the Norwood. For this damage the Francisco libeled the Waterloo, charging her with failure to adopt proper measures to secure herself from drifting; and the Norwood proceeded against the Waterloo and the storage company, making a similar charge against the former, and charging the latter with negligence as respects its mooring posts. Thereupon the Waterloo brought the Glenalvon in, charging her with negligence contributory to the collision.

I think it sufficient to say without entering upon a lengthy discussion of the evidence, that I do not believe either the Waterloo or the Glenalvon guilty of fault.    They appear to have done everything reasonably practicable to secure themselves against breaking away. As before stated they could not move without serious peril after the danger became apparent; indeed it was not urged on the argument that they could; and I am unable to see what additional efforts they could have made to secure themselves to the wharf.    The pulling out of a post on Saturday in the squall of that date, was not an indication that the remaining posts were unsafe; their successful resistance of the strain on that occasion and their appearance after it justified a belief that they were safe.    Subsequently when another gave way as the water rose and the vertical strain increased, the only additional post available was used.    The claim that an anchor should have been ·carried ashore and imbedded in the earth, cannot be sustained.    I see no reason to believe that an effort to do this would have been serviceable.    The use of an anchor under such circumstances, for the purpose indicated, is probably unprecedented. The opinions of inexperienced persons on this subject are hardly worthy of consideration.    The small anchor used by the little ves-

sel lying above, to assist in keeping her head to the wharf, where the strain was slight, may have been useful; but such an anchor carried ashore from the stern of these large vessels, where the strain was greatest, and hastily imbedded, even if practicable in their positions, would have been useless. No complaint can justly be founded on the fact that the vessels were moored side by side. This is a usual and approved method of mooring, and is practiced at all wharves where there is much commerce in this country, and probably elsewhere. Without it vessels could not, at many times, find wharfage. It follows that the Francisco's libel must be dismissed, with costs.

The Norwood, however, as we have seen, libeled the wharfinger (the storage company) also. Was it guilty of negligence in the provision made for mooring? Were the posts insufficient as charged? It is the duty of wharfingers to provide safe places for vessels, in storm as well as in fair weather. They are not insurers, but are held to a high degree of care in providing against all the perils that vessels may be expected to encounter at their wharves. Allegheny City v. Campbell, 107 Pa. St. 530; Willey v. Allegheny City, 118 Pa. St. 490, [12 Atl. 453]; Crawford v. Allegheny City [(Pa. Sup.) 16 Atl. 476]. No part of a wharf more especially demands care than the means provided for mooring. If these are equal to the best employed, such as experience has proved to be safe under all circumstances at similar wharves, the wharfinger cannot be complained of on this account. Here the vessels trading are of the largest and heaviest character, and provision for mooring should have been made accordingly. Posts sufficient to hold small vessels would be inadequate. The evidence respecting the posts which gave way, is conflicting; but in my judgment its weight is against the wharfinger. It shows, I believe, that the posts were too short, that an insufficient length was imbedded, and that proper means were not employed to guard them against the danger of lifting out under vertical strain, such as they were subjected to in this instance; and must always encounter in times of flood and storm. While they appeared to the eye to be safe, the result proved that there was substantially nothing to hold them down; and the evidence which this result affords is entitled to greater weight than the statements of witnesses who repaired the wharf. It is a significant fact that the wharf was constructed in 1865, when the adjacent channel (as was asserted on the argument without contradiction) was sufficient only for the passage of small vessels, and that the posts then inserted remained in use until the date of this accident, notwithstanding the fact that the channel had in the meantime been deepened and improved so as to accommodate the class of large vessels to which the Waterloo and Glenalvon belong. It appears that in 1893 repairs were made to the wharf by removing rotten parts, inserting a few new posts a little longer than the old ones, and resetting those of the old which were allowed to remain; but notwithstanding these repairs Mr. Pringerhoff, who superintended the work, says the wharf was not brought up to its original standard. It was mainly, if not entirely, the old posts, which were not over I think 12 feet long, and did not extend

below the upper surface of the wharf more probably than 5 to 6½ feet, and not below the framework at all, that drew out on this occasion. They seem to have come up clearly without tearing away any material part of the framework, as if no adequate means had been employed to hold them down. I say this notwithstanding the declarations of witnesses who assisted to make the repairs, because it seems to be fully warranted by the circumstances of the case. After a careful examination of all the evidence on the subject I am convinced that the posts were insufficient; that they should have been much longer and, as I believe, should have extended through the cribbing of the wharf, been driven deeply into the earth below, and been securely fastened to this cribbing as well. I have not overlooked what the wharfinger's witnesses say respecting the usual and proper method of securing posts, but other evidence is, in my judgment, entitled to greater weight. The indisputable circumstances of the case—the ease with which these posts were lifted out, and the wharfinger's subsequent acts in repairing the wharf seem to leave no room for reasonable doubt that the statements of these witnesses on their examination in chief are not reliable. The acts of the company in repairing the wharf are a virtual admission of the insufficiency of the old posts. Instead of again inserting similar ones, or securing those inserted in a similar way, they inserted new posts several times longer, passing the lower ends entirely through the frame of the wharf and imbedding them deeply in the earth below. It is true that the storm was extraordinary, though not much more so than occurs annually, and it is urged that the company learned something from it, and repaired accordingly. They could not, however, have learned anything on the subject involved that previous storms should not have taught. In all times of high flood and wind the posts are subjected to vertical strain. It is true that these posts were not previously lifted out, but it is probable they were never before subjected to the united strain of two such vessels in unusual flood and storm. The storage company cannot of course object that these vessels were moored side by side. It invited them to moor in this manner and received compensation accordingly. It will not avail the company to say that better posts would not have withstood the strain on this occasion, and that the accident must, therefore, be ascribed to the "act of God." The posts being insufficient and this insufficiency furnishing an adequate cause for the accident it must be ascribed to this cause and not to an "act of God." The storage company must, therefore, be held responsible for the consequences.

I do not think there is any justification for the charge that the Norwood threw off her stern line as the Waterloo swung towards her, and thus contributed to the injury. I believe the witnesses who say she did are mistaken. The men upon her at the time say she did not, they explain what was done, and what may possibly have led to the mistake. There was no motive for casting off the line. The act would necessarily increase her danger, and I do not believe she did it. The Norwood's libel against the storage company must, therefore, be sustained with costs.